**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Mashal Sherzad,

               Plaintiff,                            **MEMORANDUM OPINION**
                                                   **AND ORDER**

     v.                                         Civil No. 24-1739 ADM/EMB

Melinda Pettigrew, Thai Nguyen, Timothy
Beebe, John Doe, Jane Roe, University of
Minnesota, and Rachel Croson,

               Defendants.

---

Jordan S. Kushner, Esq., Law Office of Jordan S. Kushner, Minneapolis, MN, on behalf of
Plaintiff.

Brent P. Benrud, Esq., and Lisa L. Beane, Esq., University of Minnesota Office of the General
Counsel, Minneapolis, MN, on behalf of Defendants.

---

## I.  INTRODUCTION

On July 30, 2025, the undersigned United States District Judge heard oral argument on
Defendants Melinda Pettigrew, Thai Nguyen, Timothy Beebe, John Doe, Jane Roe, University of
Minnesota, and Rachel Croson's (collectively, "Defendants") Motion for Summary Judgment
[Docket No. 47] and Motion to Exclude Expert Testimony [Docket No. 41].  For the reasons set
forth below, the motion for summary judgment is granted and the motion to exclude expert
testimony is denied as moot.

## II.  BACKGROUND

Plaintiff Mashal Sherzad ("Sherzad"), a Muslim queer woman of Afghan descent, was
the Program Manager of Diversity, Equity, and Inclusion ("DEI") at the University of
Minnesota's School of Public Health.  She was fired from this position after she posted on her

personal social media page a photograph of herself standing next to an Israeli flag painted with red swastikas. Sherzad commenced this action against Defendants, alleging deprivation of her First and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983, and discrimination based on race, color, creed, religion, and national origin in violation of state and federal law. Defendants now move for summary judgment on all claims, and also move to exclude the testimony of Sherzad's expert witness, Dr. Barry Trachtenberg.

## A. Sherzad is Hired as Program Manager of Diversity, Equity and Inclusion

In October 2023, Sherzad was hired to serve as the Program Manager of Diversity, Equity, and Inclusion ("DEI") at the University of Minnesota's School of Public Health ("SPH"). Kushner Decl. Ex. F [Docket No. 67, Attach 6] ("Sherzad Dep.") at 84:13-16. SPH has 130 faculty members that serve nearly 1,000 students. Pettigrew Decl. [Docket No. 53] ¶ 4. SPH's DEI Office is operated through the SPH Dean's Office. Benrud Decl. Ex. 2 [Docket No. 50, Attach. 2] at 8:25-9:8. The DEI Office provides DEI education, advocacy, planning and support to the entire SPH community, including faculty, staff, students, alumni, and individuals more broadly interested in SPH. Id. at 9:3-8; Pettigrew Decl. ¶ 5. The DEI Office's three-person staff included Director of DEI Lauren Jones, who served as Sherzad's direct supervisor, an Associate DEI Director, and Sherzad. Benrud Decl. Ex. 2 at 8:4-7, 9:12-16; Pl.'s Sealed Exs. [Docket No. 68] at 12.[1]

As DEI Program Manager, Sherzad's duties were to work with SPH leadership, faculty, staff, and students to implement and support SPH's DEI programs and initiatives, and to "serve[] as an expert in process and progress toward becoming a school that centers anti-racism and anti-oppression." Benrud Decl. Ex. 1 [Docket No. 50, Attach. 1] at UMN000705. She was also

---

[1] Page citations for Pl.'s Sealed Exs. are to the page number located in the CM/ECF banner at the top of the page.

expected to serve as a liaison between the DEI Director and academic divisions to implement the Strategic Plan for Antiracism at SPH.  Id.  Sherzad was expected to carry out her duties with "a high degree of independence."  Id.  Her first day of work was October 30, 2023.  Kushner Decl. Ex. D [Docket No. 67, Attach. 4] ("Jones Dep.") at 17:10-20.

**B.  Sherzad's Social Media Post**

In early December 2023, about six weeks after starting her job at SPH, Sherzad took a pre-approved vacation to Spain with her domestic partner.  Sherzad Dep. at 87:19-88:2; Jones Dep. at 36:12-17.  While Sherzad was touring Barcelona on December 9, she observed a peaceful protest over the Israel/Hamas conflict which had escalated in the months following October 7, 2023.  Sherzad Dep. at 93:7-94:7; Benrud Decl. Ex. 8 [Docket No. 51, Attach. 3] at UMN000689.  Sherzad's partner took a picture of her standing next to an Israeli flag that had two large red swastikas spray painted on it.  Sherzad Dep. at 95:12-15; 96:20-22; Benrud Decl. Ex. 3 [Docket No. 51] at UMN000858.  Sherzad spoke with a man who was holding the flag and learned that he was a Jewish person opposed to Israel's actions.  Sherzad Dep. at 95:19-96:1.

Later that day, while still on vacation in Spain, Sherzad posted the picture, along with four other photos from the protest, to her private personal Instagram account and included a caption for the series of photos that stated, "This is not a war.  This is not a conflict.  This is GENOCIDE."  Id. at 101:7-17;103:6-14; Benrud Decl. Ex. 3 at UMN000858.  Sherzad did not realize the post was automatically shared to her personal Facebook account, which has 6,000 followers.  Sherzad Decl. at 101:12-20, 108:19-22.

**C.  Reaction to Sherzad's Post**

Two days later, on December 11, 2023, several University officials received an email from a member of the public alerting them to Sherzad's social media post.  Benrud Decl. Ex. 3

[Docket No. 51]. The email, which included a screenshot of the post, expressed concern about the photo of Sherzad standing by the Israeli flag that was graffitied with red swastikas. Id. The email noted that the University's website lists Sherzad as the DEI Program Manager for SPH, and that "a practitioner of Diversity, Equity, and Inclusion should understand the genocidal implications of such a symbol --- of superimposing the graphic representation of the mass extermination of Jews onto the flag of Israel." Id. at UMN000857. The writer questioned how individuals on the University campus with concerns of bias and discrimination could be expected to work with Sherzad or be supported by her office's work. Id. The writer also expressed concern about other social media posts by Sherzad pertaining to the Israel/Hamas conflict. Id. at UMN000857, UMN000859-60. Sherzad does not know the person who sent the email, and the individual has no known affiliation with SPH or the University of Minnesota. Sherzad Dep. at 108:5-9; Kushner Decl. Ex. C [Docket No. 67, Attach. 3] ("Beebe Dep.") at 45:22-47:9; Kushner Decl. Ex. A [Docket No. 67, Attach. 1] ("Pettigrew Dep.") at 24:6-25:8; Kushner Decl. Ex. B [Docket No. 67, Attach. 2] ("Nguyen Dep.") at 27:21-28:22, 33:8-23.

One of the recipients of the email was Sherzad's direct supervisor, Jones. Benrud Decl. Ex. 3 at UMN000857; Benrud Decl. Ex. 2 at 26:2-11; Sherzad Dep. at 84:20-21. Jones considered the photo to be "jarring" and the Israeli flag painted with red swastikas to be "very offensive." Benrud Decl. Ex. 2 at 26:24-25, 32:10-14. Jones felt that the use of red paint, which looked like blood, could be viewed as advocating for violence. Id. at 32:25-33:4. Jones called Sherzad, who had returned from Spain, and asked her to take the photo down, which she did. Id. at 28:17-24, 31:18-21; Pl's Sealed Exs. at 19; Sherzad Dep. at 105:22-24; 106:9-18.

Minutes after speaking with Jones, Sherzad sent an email to Jones and other University officials apologizing for the "photo in question" and stating that she had deleted the photo from

4

her social media account.  Pl.'s Sealed Exs. at 16.  Sherzad explained that the flag was not hers and that it was being held by a Jewish person who was also holding a sign that said, "Jews for Peace – No Genocide in our Name."  Id.  She also stated that the flag did not "cosign the absolute atrocity that was the Holocaust.  It was meant to draw a parallel."  Id.  Sherzad admitted that the photo "could and did get taken out of context," and vowed to be more selective of what she posts on her personal social media.  Id.  Sherzad removed the photo from her social media accounts less than 45 minutes after University officials received the email complaining about the post.  See Pl.'s Sealed Exs. at 16, 20 (showing email received at 4:02 p.m. and photo removed by 4:46 p.m.); Beebe Dep. at 78:17-23; Nguyen Dep. at 48:15-49:4.

Another recipient of the email from the unknown complainant was Defendant Timothy Beebe, who was serving as Interim SPH Dean.  Benrud Decl. Ex. 3 at UMN000857.  Beebe considered the image of Sherzad standing next to the Israeli flag with red swastikas painted on it to be threatening and antisemitic.  Benrud Decl. Ex. 4 [Docket No. 50, Attach. 3] at 22:24-23:4. While Beebe was not bothered by the other pictures and political posts on Sherzad's social media page, he characterized the image of her with the flag as an "appalling visual."  Id. at 47:10-48:17, 75:18-19.  Beebe felt that Sherzad's posting of the photo showed she was lacking "judgment to navigate nuance[d] conversations, lead conversations, [and] cultivate an ethos of inclusion" that was necessary for performing her DEI role.  Id. at 61:6-17.

Beebe discussed the email and photo with Defendant Melinda Pettigrew, who was about to begin work as the new SPH Dean, and Defendant Rachel Croson, the University's Provost. Id. at 75:13-25.  Although they shared Beebe's concerns, Croson was not sure whether the University could take any action because the photo was on Sherzad's personal social media page. Id. at 75:18-22; Benrud Decl. Ex. Ex. 5 [Docket No. 50, Attach. 4] at 14:21-15:12; Pl.'s Sealed

Exs. at 1.  Croson, however, remarked that the "damage ha[d] been done," and that the posted image would likely have an impact on Sherzad's effectiveness in her DEI position and on her career more generally, because the photo was "out in the ecosphere" and was inconsistent with her role of cultivating inclusion and making others feel welcome.  Pl.'s Sealed Exs. at 1, 17; Benrud Decl. Ex. 5 at 14:23-15:6.

**D. Investigation**

On December 12, 2023, the day after receiving the email from the member of the public, Beebe directed Defendant Thai Nguyen, SPH Director of Human Resources, to conduct an investigation into Sherzad's social media post.  Beebe Dep. at 76:19-23.  Sherzad was placed on administrative leave with pay pending completion of the investigation.  Benrud Decl. Ex. 6 [Docket No. 51, Attach. 1]; Pl.'s Sealed Exs. at 15.  At the time Sherzad was placed on leave, a Senior Human Resources Consultant emailed Nguyen, stating:

> I feel compelled to say my opinion.
>
> I do not understand how advocating for Palestine is inconsistent with the expectations of a DEI program manager.  Fighting for a free Palestine and speaking up against the genocide of Palestinians is in direct alignment with core DEI values (advocating for the marginalized and oppressed groups).  DEI work is not impartial and neutral.
>
> In fact, fighting for a free Palestine is intertwined with global liberations struggles including the Black Lives Matter in the U.S.

Pl.'s Sealed Exs. at 15.

As part of his investigation, Nguyen and another University human resources employee interviewed Sherzad on December 20, 2023.  Benrud Decl. Ex. 8 at UMN000688.  Sherzad confirmed that she created the social media post and that she was the person standing next to the Israeli flag with red swastikas spray painted on it.  Id.  She explained that the image was meant

to draw a parallel between Nazi Germany's treatment of Jews and Israel's treatment of Palestinians. Id. at UMN000689. Sherzad stated that she now realizes that the post was triggering and that she learned from the experience not to post swastikas or other hateful symbols. Id. at UMN000689-90. She also stated that she believed that the sender of the complaining email is affiliated with someone she described as a Zionist who has allegedly harassed her via Facebook in the past. Id.

Nguyen also interviewed Sherzad's supervisor, Jones. Benrud Decl. Ex. 7 [Docket No. 51, Attach. 2] at UMN000935. Jones stated that Sherzad had started her job less than 60 days earlier, and that during that time she had been doing a good job of listening, learning, engaging with colleagues, and showing a commitment to DEI work. Id. Although Jones had no concerns with Sherzad's conduct prior to the social media post, she felt that the photo Sherzad posted was not aligned with the work of the DEI Office and that Sherzad would need a great deal of coaching going forward. Id. at UMN000936, UMN000938. Jones also noted less serious concerns with Sherzad's decision-making, such as inappropriate work attire, which Jones attributed to Sherzad being young and lacking experience. Id. at UMN000938. When asked whether she felt Sherzad would be responsive to coaching, Jones responded that she was not certain, because coaching is effective for some people but not others. Id. She also noted that Sherzad has a very robust online presence and would need to work on compartmentalizing to be effective in her DEI work. Id.

At the conclusion of the investigation, Nguyen presented the report of his investigation to Beebe. Benrud Decl. Ex. 9 [Docket No. 50, Attach. 5] at UMN000704; Pl.'s Sealed Exs. at 11-12. After reviewing the report, Beebe concluded that Sherzad's employment should be terminated because he "question[ed] her judgment and ability to perform her roles and

responsibilities in an inclusive manner."  Benrud Decl. Ex. 9 at UMN000703.  Beebe deferred

the final decision to Defendant Pettigrew, because Pettigrew was a few days away from taking

over as SPH Dean.  Id.

Pettigrew reviewed the report and stated that she "agree[d] with [Beebe] and the

assessment that these issues make it difficult, if not impossible, for [Sherzad] to do her job

effectively."  Id.; Benrud Decl. Ex. 10 [Docket No. 50, Attach. 6] at 135:1-4.  Pettigrew's

decision to terminate Sherzad's employment was based on her conclusion that Sherzad's

decision to post a photograph containing a hate symbol was incompatible with her DEI role,

showed a lack of judgment and sensitivity, and undermined the DEI Office's ability to create a

safe and inclusive environment.  Benrud Decl. Ex. 10 at 95:14-19, 96:3-7, 106:10-22, 107:5-9.

After reaching her decision, Pettigrew convened a meeting with Human Resources, the

University's general counsel, Provost Croson, and other University officials to discuss the

employment termination process.  Id. at 48:1-11, 53:10-54:8.

## E.  Termination of Sherzad's Employment

On January 10, 2024, Pettigrew and Nguyen met with Sherzad and informed her of

Pettigrew's decision to end her employment.  Pettigrew Decl. ¶ 6.  The meeting was the first time

that Pettigrew had met Sherzad.  Pettigrew Dep. at 17:17-20.  Sherzad was provided with a letter,

signed by Pettigrew, that explained the reasons for the decision.  Benrud Decl. Ex. 11 [Docket

No. 50, Attach. 7] at UMN000105.  The letter stated that Sherzad's conduct in posting the

"highly inflammatory" image "directly undermin[ed] her credibility" as Program Manager for

DEI.  Id.  The letter further explained that "continuing your employment would disrupt the

School's ability to operate credibly in the DEI arena and in effectively supporting all members of

the School's community."  Id.  Sherzad's University employment was terminated effective

8

January 24, 2024.  Id.  Although University officials discussed preparing for media requests about the matter, no media requests were received by SPH.  Beebe Dep. at 93:14-24.

**F.  Present Lawsuit**

After Sherzad was fired, she filed this lawsuit alleging First Amendment and discrimination claims under 42 U.S.C. §§ 1983 and 1981, and discrimination claims under the Minnesota Human Rights Act ("MHRA").  Defendants now move for summary judgment on all claims.  Defendants have also filed a motion to exclude the testimony of Sherzad's expert, Dr. Barry Trachtenberg.

### III. DISCUSSION

**A.  Summary Judgment Motion**

**1.  Standard of Review**

Federal Rule of Civil Procedure 56 provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in its favor.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation omitted).

If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate.  Id.  However,

"[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

### 2. First Amendment Claim (Count 1)

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). However, when the government acts as an employer, it has "a freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large." Waters v. Churchill, 511 U.S. 661, 671 (1994) (plurality opinion). This is because "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." Garcetti, 547 U.S. at 418. Indeed, "[w]hen someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her." Waters, 511 U.S. at 675.

A government employee does not, however, "relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." Connick v. Myers, 461 U.S. 138, 140 (1983). When an employee speaks as a citizen on a matter of public concern, the government employer's restrictions on the employee's speech "must be directed at speech that has some potential to affect the entity's operations." Garcetti, 547 U.S. at 418. In other words, a public employee speaking on matters of public concern "must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." Id. at 419.

To determine whether the First Amendment protects particular speech by a government employee, courts apply a three-step analysis. <u>Henry v. Johnson</u>, 950 F.3d 1005, 1011 (8th Cir. 2020); <u>Anzaldua v. Ne. Ambulance & Fire Prot. Dist.</u>, 793 F.3d 822, 832-33 (8th Cir. 2015); <u>Palmer v. Cnty. of Anoka</u>, 200 F. Supp. 3d 842, 847 (D. Minn. 2016). First, the court inquires "whether the employee spoke as a citizen on a matter of public concern." <u>Garcetti</u>, 547 U.S. at 418. Second, the court asks whether the public employer has produced evidence to show that the speech caused an actual or reasonably foreseeable disruption to the employer's operations. <u>Anzaldua</u>, 793 F.3d at 833-34. If the answer to these two threshold questions is yes, the court proceeds to step three and balances "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." <u>Id.</u> at 832 (quoting <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563, 568 (1968)).

The threshold inquiries and balancing analysis are questions of law for the court, but any underlying factual disputes about whether the plaintiff's speech is protected should be submitted to a jury. <u>Shands v. City of Kennett</u>, 993 F.2d 1337, 1342 (8th Cir. 1993)

### a. Speech as a Citizen on a Matter of Public Concern

The parties agree that Sherzad's social media post relating to the Israel/Hamas conflict was on a matter of public concern. Additionally, Sherzad spoke as a private citizen on her personal social media account rather than in connection with her employment duties. As such, the possibility of a First Amendment Claim arises and the analysis proceeds to step two.

### b. Actual or Reasonably Foreseeable Disruption

To satisfy the second threshold inquiry, an employer must produce either evidence of actual disruption or evidence showing that the employer's prediction of future disruption was

11

reasonable. Anzaldua, 793 F.3d at 833-34. The Eighth Circuit has repeatedly stated that "evidence of actual disruption . . . is not required in all cases." Id. at 833 (quoting Bailey v. Dep't of Elementary & Secondary Educ., 451 F.3d 514, 521 (8th Cir. 2006)) (quoting in turn Shands, 993 F.2d at 1344). This is because "[a]n employer need not 'allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.'" Henry, 950 F.3d at 1012 (quoting Connick, 461 U.S. at 152). As such, courts "have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large." Hemminghaus v. Missouri, 756 F.3d 1100, 1112 (8th Cir. 2014) (quoting Waters, 511 U.S. at 673). Additionally, courts "have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern." Id. (quoting Waters, 511 U.S. at 673).

Defendants have produced evidence showing that Sherzad's decision to post a picture of herself posing next to an Israeli flag defaced with two large red swastikas created both an actual and reasonably foreseeable disruption to SPH's DEI operations.

Turning first to actual disruption, Sherzad's posting of her photo on social media six weeks after being hired as DEI Program Manager caused her ultimate supervisor, Dean Pettigrew, to conclude that Sherzad lacked the judgment, sensitivity, and awareness necessary to perform her DEI role effectively. Benrud Decl. Ex. 9 at UMN000703; Benrud Decl. Ex. 10 at 95:14-19, 106:20-22, 107:4-9. A supervisor's loss of confidence in an employee's judgment constitutes a disruption of the workplace. See Palmer, 200 F. Supp. 3d at 846, 848 (holding that county attorney's loss of confidence in his spokesperson's judgment constituted disruption where

the county attorney reasonably predicted that the spokesperson's inflammatory Facebook posts would offend law enforcement and others whom the county attorney served).

Pettigrew's loss of confidence in Sherzad's judgment was reasonable. It was critical that Pettigrew be able to trust Sherzad's judgment, because Sherzad was expected to perform her duties with a high degree of independence, and Sherzad's job involved direct interaction with staff, students, faculty, and other stakeholders in the SPH community. Given Sherzad's critical error in judgment just six weeks after starting her job at SPH, Pettigrew reasonably concluded that Sherzad lacked the judgment necessary to effectively perform her DEI role.

In addition to actual disruption, it was reasonable for Defendants to predict that the image Sherzad posted on her account with 6,000 followers would cause future disruption. As DEI Program Manager for SPH, Sherzad was expected to support the DEI Office's mission of providing an inclusive and welcoming work and learning environment for SPH's diverse community. She was also expected to demonstrate a commitment to DEI and anti-discrimination principles. It was reasonably foreseeable that Sherzad's posting of a photo of herself posing next to a widely recognized hate symbol[2] would directly undermine her credibility as a DEI professional, erode the trust of those she was intended to serve, discredit the DEI Office, and disrupt SPH's efforts to implement its DEI programs and to create an inclusive environment. The photo was facially offensive and was posted at a time of heightened tension and conflict around Israeli/Palestinian issues. The divisive nature of the symbol was directly at odds with the principles of inclusion and anti-discrimination that Sherzad was responsible to uphold in her DEI role. Given the specific nature of Sherzad's job and the specific nature of her speech, it was reasonable for Defendants to conclude that Sherzad lacked the sensitivity and awareness to

---

[2] "Regardless of its ancient or historic origins, the swastika today is a potent symbol of intolerance, hatred, and violence." Dickinson v. Austin, 942 F.2d 791 (9th Cir. 1991).

continue in her DEI position, and that allowing her to remain in her role would disrupt SPH's ability to credibly and effectively carry out its DEI initiatives.

The direct relationship between the nature of Sherzad's speech and the nature of her job distinguishes this case from the Eighth Circuit's recent decision in Melton v. City of Forrest City, 147 F.4th 896 (8th Cir. 2025).  In that case, an off-duty firefighter posted a black and white image to his personal Facebook account that depicted a silhouette of a baby in the womb with a rope around its neck and the caption "I can't breathe!"  Id. at 900.  The firefighter posted the image to convey his opposition to abortion.  Id.  The city's mayor received numerous complaints from police officers, city council members, and citizens who were offended by the post because they thought that the image looked like a noose around the neck of a black child.  Id. at 900-901.  Some citizens told the mayor they did not want the firefighter to come to their house for a medical call or fire emergency.  Id. at 901.  The mayor terminated the firefighter's employment after concluding that the complaints threatened the city's ability to administer public services.  Id.  The Eighth Circuit held that the record was a "tossup" on whether the racially offensive post caused actual or reasonably foreseeable disruption, because no firefighter complained about the post and there was no "showing of how [the post] actually affected the government's ability to deliver 'public services'---here, fighting fires and protecting public safety."  Id. at 903.

Unlike the firefighter in Melton, whose offensive post did not relate to firefighting and did not implicate his ability to fight fires, Sherzad's post of herself posing next to a swastika-graffitied Israeli flag directly implicated her ability to credibly serve in her job as Program Manager for Diversity, Equity, and Inclusion.  Given the close relationship between Sherzad's speech and her job, Defendants' termination of Sherzad's employment was justified.  See Garcetti, 547 U.S. at 418 (noting that the question of "whether the relevant government entity

14

had an adequate justification for treating the employee differently from any other member of the general public" is a consideration that "reflects the importance of the relationship between the speaker's expressions and employment").

Sherzad argues that posting the image did not undermine her credibility as a DEI professional because a Senior Human Resources Director wrote an email supporting Sherzad and stating that advocating for Palestine "is in direct alignment with core DEI values." Pl.'s Sealed Exs. at 15. However, it is undisputed that Defendants' concern was not with Sherzad's comments on social media in support of Palestine, but was instead limited to the photo of Sherzad posing next to an Israeli flag with red swastikas painted on it. See Sherzad Dep. at 103:16-104:17 (deposition testimony by Sherzad stating that she continued to post about her views on Palestine and that no one from the University took issue with those posts); id. at 110:25-111:5 (stating that University officials were only concerned with the photo); Pl.'s Mem. Opp'n Summ. J. [Docket No. 66] at 6 ("It was only the photo . . . containing an Israeli flag with swastikas on it that presented a problem for Defendants and constituted the grounds for termination."). Indeed, the photo was the only item that Sherzad was asked to remove from her social media account. See Pl.'s Sealed Exs. at 19 (email from Jones to University officials stating that she asked Sherzad "to take the post with the swastikas down"); id. at 16 (email from Sherzad stating that "the photo in question has been deleted from my personal social media"). As to the photo, Sherzad herself admitted that it was "obviously . . . problematic," Sherzad Dep. at 103:20-21, and that the "photo could and did get taken out of context." Pl.'s Sealed Exs. at 16. It was reasonable for Defendants to conclude that the image Sherzad posted of herself standing next to an Israeli flag that was defaced with red swastikas undermined her credibility as a DEI

professional and showed that she lacked the judgment, sensitivity, and awareness to effectively perform her DEI role.

Sherzad also argues that Defendants' prediction of future disruption was not reasonable because no one outside of those included on the email to University officials saw the post, and there was no basis for believing that others would subsequently see it because the post had been deleted. This argument ignores the evidence showing that Defendants were aware that Sherzad had a robust social media presence, the post had been active for two days, and that a screenshot of the photo existed and could be widely shared through social media, email, or other means. Given these circumstances, Defendants' prediction of future disruption was reasonable, and they were permitted to minimize or avoid that disruption by taking action to address the situation. Connick, 461 U.S. at 152 ("[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.").

Because the photo Sherzad posted of herself posing next to a hate symbol created an actual and reasonably foreseeable disruption to the effectiveness and integrity of SPH's DEI operations, the Court proceeds to the Pickering balancing test.

### c. Pickering Balancing

The Pickering balancing test requires the Court to weigh "the interests of [Sherzad], as a citizen, in commenting upon matters of public concern" against "the interest of [SPH], as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568. In balancing these competing interests, the Court considers six factors:

> (1) the need for harmony in the work place; (2) whether the government's responsibilities require a close working relationship;

> (3) the time, manner, and place of the speech; (4) the context in
> which the dispute arose; (5) the degree of public interest in the
> speech; and (6) whether the speech impeded the employee's ability
> to perform his or her duties.

Anzaldua, 793 F.3d at 835.   "[T]he Pickering balance is flexible and the weight to be given to

any factor varies depending on the circumstances of the case."  Germann v. City of Kan. City,

776 F.2d 761, 764 (8th Cir. 1985).  An analysis of the Pickering factors leads the Court to

conclude that the interests of SPH in promoting the efficiency and effectiveness of its DEI

programs and services outweighs Sherzad's interest, as a citizen, in posting the photo of herself

next to an Israeli flag with red swastikas painted on it.

The first two factors---the need for harmony in the workplace and whether the

government's responsibilities require a close working relationship---weigh in favor of

Defendants.  Given that Sherzad's job was to foster an inclusive and supportive work

environment for all members of the SPH community, the need for harmony in the workplace was

high.  The inflammatory photo Sherzad posted was contrary to workplace harmony, particularly

given Sherzad's role as Program Manager for DEI.  Additionally, Sherzad's responsibilities

required her to work with SPH leadership, faculty, staff, and students to implement SPH's DEI

programs and initiatives.  It was reasonable to predict that the photo would cause Sherzad to lose

credibility and trust among those she worked with and served in her DEI role, which in turn

would disrupt SPH's ability to effectively pursue its DEI initiatives.

Sherzad argues that there is no evidence that her social media post affected harmony in

the workplace or any working relationships.  However, the photo she posted did impair her

working relationship with Dean Pettigrew, who concluded that Sherzad lacked the judgment and

awareness necessary for her DEI role.  Defendants were not required to wait for further

disruptions to work relationships or threats to workplace harmony to surface before taking

action.

The third factor---the time, place, and manner of the speech---also tips in Defendants'
favor. Typically, when an employee speaks privately outside the workplace and on their own
time, the speech is entitled to greater protection because there is little danger that the private
statement will disrupt the workplace or reach the public and discredit the office. Rankin v.
McPherson, 483 U.S. 378, 388–89 & n.13 (1987); Shands, 993 F.2d at 1345–46. Although
Sherzad spoke on her own time and outside the workplace, she posted the inflammatory image to
her social media account, where it could be seen by her 6,000 Facebook followers. This created
a substantial risk that the image would reach the SPH community and disrupt SPH's ability to
effectively and efficiently implement its DEI initiatives. See Liverman v. City of Petersburg,
844 F.3d 400, 407 (4th Cir. 2016) ("A social media platform amplifies the distribution of the
speaker's message—which favors the employee's free speech interests—but also increases the
potential, in some cases exponentially, for departmental disruption, thereby favoring the
employer's interest in efficiency.")

The fourth factor---the context in which the dispute arose---favors Sherzad. This factor
pertains to whether the employee's "speech arose in the context of a public debate," or was
instead "part of an internal office grievance." Bowman v. Pulaski Cnty. Special Sch. Dist., 723
F.2d 640, 645 (8th Cir. 1983). "[A]n employee's speech that arises from a purely academic
interest is entitled to more protection than speech that arises from a personal dispute with a
government employer." Shands, 993 F.2d at 1346 (8th Cir. 1993) (citing Connick, 461 U.S. at
153). Sherzad's speech arose in the context of a public debate and was not concerning a personal
employment dispute.

The fifth factor---degree of public interest in the speech---does not favor either party. This factor "looks at whether the speech should receive heightened protection because it has some quality or perspective that gives it 'special value' to the public." Gustilo v. Hennepin Healthcare Sys., Inc., No. 0:22-00352 (SRN/DJF), 2025 WL 2539116, at *30 (D. Minn. Sept. 4, 2025) (quoting Lane v. Franks, 573 U.S. 228, 240 (2014)). For example, an employee's speech will be given added weight if the employee has specialized knowledge on matters of public concern that has been gained through their employment. Id. (citing Lane, 573 U.S. at 240); see also Waters, 511 U.S. at 674 (plurality opinion) ("Government employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions."). Similarly, "an employee's first amendment interest is entitled to more weight where [the employee] is acting as a whistle-blower exposing government corruption." Noon v. City of Platte Woods, 94 F.4th 759, 765–66 (8th Cir. 2024).

The degree of the public's interest in Sherzad's speech was modest because she did not have any particularized knowledge or expertise on the issues on which she was commenting, and she was not acting as a whistleblower. Rather, Sherzad "was simply adding her views to the views of countless others." Palmer, 200 F. Supp. 3d at 848 (finding employee's Facebook posts not entitled to added protection where the employee "d[id] not have any particular expertise on the issues on which she was commenting, nor was she acting as a whistleblower or contributing previously unknown facts or insights to the public debate").

The final factor---whether the speech impeded the employee's ability to perform his or her duties---weighs strongly in favor of Defendants. As Program Manager for Diversity, Equity, and Inclusion, Sherzad's job was to promote DEI programs and foster a welcoming and inclusive environment at SPH. Sherzad's posting a photo of herself next to an Israeli flag graffitied with

large red swastikas undermined her credibility as a DEI professional.  The divisive nature of the red swastika symbol was directly at odds with the principles of inclusion and anti-discrimination that Sherzad was responsible to uphold in her DEI role.  Sherzad's direct supervisor, Jones, considered the photo to be inconsistent with the DEI work her team performs.  The posted photo caused Sherzad's ultimate supervisor, Pettigrew, to conclude that Sherzad lacked the judgment necessary to perform her role, and that allowing her to remain in her position would disrupt the SPH DEI Office's mission of implementing its DEI programs and initiatives.  Given the nature of Sherzad's job as a DEI professional and the nature of her speech showing her posing with a hate symbol on social media, the picture Sherzad posted impeded her ability to credibly and effectively work as Program Manager for DEI.

For these reasons, the Pickering factors weigh decisively in Defendants' favor, and Sherzad's First Amendment claim is dismissed.  In reaching this conclusion, the Court acknowledges Sherzad's right as a citizen to speak on matters of public concern, including voicing her opposition to genocide.  However, it is undisputed that the University's concern with Sherzad's speech was specifically targeted to the photo at issue, and not with Sherzad's other posts or comments about Palestine or genocide.  Sherzad Dep. at 104:2-17; 110:25-5.  Sherzad's interests in posting the inflammatory photo are outweighed by SPH's interests, as an employer, in the efficiency and integrity of its DEI Office's operations.

### 3. Employment Discrimination Claims (Counts 2, 4 and 5)

Sherzad also asserts claims for employment discrimination based on race, color, creed, religion, and national origin under three different legal theories:  the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. § 1981, and the Minnesota Human Rights Act ("MHRA").  See Am. Compl. [Docket No. 18] ¶¶ 46, 48-49.  These claims are all subject to

"essentially the same" analysis that applies to discrimination claims arising under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e.  See Henry v. Hobbs, 824 F.3d 735, 738 (8th Cir. 2016) (stating that employment discrimination claims under the Equal Protection Clause and § 1981 are subject to Title VII disparate-treatment analysis); Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 441-42 (Minn. 1983) (applying Title VII analysis to MHRA employment discrimination claims).

Sherzad did not provide direct evidence of discrimination, so her claims are analyzed using the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Lucke v. Solsvig, 912 F.3d 1084, 1087 (8th Cir. 2019); Johnson v. Schulte Hosp. Grp., Inc., 66 F.4th 1110, 1114 (8th Cir. 2023).  Under this framework, the "plaintiff must first present a prima facie case of intentional discrimination.  The burden then shifts to [the] defendant to articulate a legitimate, nondiscriminatory reason for its action.  If [the] defendant meets that minimal burden, [the] plaintiff must show that the proffered nondiscriminatory reason is merely a pretext for unlawful race discrimination."  Putman v. Unity Health Sys., 348 F.3d 732, 735 (8th Cir. 2003).

To establish a prima facie case of discrimination, Sherzad must show "(1) [s]he is a member of a protected class, (2) [s]he met h[er] employer's legitimate expectations, (3) [s]he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)."  Lake v. Yellow Transp., Inc., 596 F.3d 871, 874 (8th Cir. 2010).

The Court need not address the first three elements, because Sherzad has not adduced sufficient evidence to satisfy the fourth element of a prima facie discrimination case.  She argues that this element is met because "other University employees," including professors from the

University's law school and college of liberal arts, have expressed strong and controversial views on social media about the Israel/Hamas conflict and were not fired from their jobs. Pl.'s Mem. Opp'n. Summ. J. [Docket No. 66] at 40; Kushner Decl. [Docket No. 67] ¶ 7; Sherzad Dep. at Ex. 57.

This argument lacks merit because these employees are not similarly situated. A similarly situated employee "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Evance v. Trumann Health Servs., 719 F.3d 673, 678 (8th Cir. 2013). The University employees identified by Sherzad are not similarly situated because, among other things, they were faculty members rather than DEI professionals, they worked in different academic units with a different Dean, and there is no evidence that their speech included the use of a hate symbol. Sherzad has not identified any similarly situated employees outside of her protected class who were treated differently, nor has she presented other evidence that would give rise to an inference of discrimination. Accordingly, she has not met her burden of showing a prima facie case of discrimination.

Even if Sherzad could demonstrate a prima facie discrimination case, Defendants have presented a legitimate, non-discriminatory reason for their decision to terminate her employment. As discussed above, Defendants reasonably believed that Sherzad's social media post showing her standing next to an Israeli flag with red swastikas painted on it undermined her ability to effectively and credibly perform her duties, and that this would disrupt SPH's ability to implement its DEI programs and provide a supportive environment for all members of the SPH community. Sherzad has not presented evidence to show that this reason was pretext for unlawful discrimination. Because Sherzad cannot discredit Defendants' proffered reasons and

has not adduced any evidence to suggest that Sherzad's race, ethnicity, gender, or religion contributed to the decision to end her employment, the discrimination claims are dismissed.[3]

### 4. Conspiracy Claim (Count 3)

To support a § 1983 conspiracy claim, a plaintiff must first prove a deprivation of a constitutional right or privilege.  Henry, 950 F.3d at 1015; White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008) (citing Askew v. Millerd, 191 F.3d 953, 957 (8th Cir. 1999)).  For the reasons discussed above, Sherzad has not adduced sufficient evidence from which a reasonable jury could find that she has been deprived of a constitutional right or privilege.  As such, her conspiracy claim is dismissed.

### 5. Qualified Immunity

Defendants also argue that Sherzad's claims against the Individual Defendants are barred by qualified immunity.  Qualified immunity shields government officials from § 1983 lawsuits and liability "unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." LaCross v. City of Duluth, 713 F.3d 1155, 1157 (8th Cir. 2013).  When analyzing claims of qualified immunity at the summary judgment stage, a court conducts a two-prong inquiry that considers (1) whether the facts, viewed in the light most favorable to the party asserting the injury, show that an official violated

---

[3] Sherzad's discrimination claim under 42 U.S.C. § 1981 fails for the additional reason that it is improperly pled.  Eighth Circuit precedent holds that direct § 1981 claims against state actors are prohibited and must instead be brought pursuant to § 1983.  Onyiah v. St. Cloud State Univ., 5 F.4th 926, 929–30 (8th Cir. 2021).  As such, Sherzad's § 1981 claims against the individually named Defendants must be dismissed.  Sherzad's § 1981 claim against the University is likewise barred because states and instrumentalities of the states are protected by Eleventh Amendment immunity and are not "persons" subject to suit under § 1983 or § 1981.  Will v. Michigan Dep't of State Police, 491 U.S. 58, 70–71 (1989); Mungai v. Univ. of Minnesota, 141 F.4th 959, 967 (8th Cir. 2025); Bunch v. Univ. of Arkansas Bd. of Trs., 863 F.3d 1062, 1067 (8th Cir. 2017).

a federal right, and (2) whether the right was clearly established at the time of the violation.

Hemminghaus, 756 F.3d at 1110.

Here, Sherzad has not adduced sufficient evidence to show that the Individual Defendants violated a federal right. Accordingly, the Individual Defendants are entitled to qualified immunity on all claims.

For the above reasons, Defendants' summary judgment motion is granted as to all claims.

**B. Motion to Exclude Expert Testimony**

Defendants also move to exclude the expert testimony of Dr. Barry Trachtenberg, a history professor at Wake Forest University. Because summary judgment is granted to Defendants on all claims, the motion to exclude expert testimony is denied as moot.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants Melinda Pettigrew, Thai Nguyen, Timothy Beebe, John Doe, Jane Roe, University of Minnesota, and Rachel Croson's Motion for Summary Judgment [Docket No. 47] is **GRANTED**;

2. Defendants' Motion to Exclude Expert Testimony [Docket No. 41] is **DENIED AS MOOT**; and

3. The Amended Complaint [Docket No. 18] is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

Dated: October 30, 2025

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE